# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| WILLIAM LYONS, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 3:14-cv-1906 |
| | ) Judge Sharp |
| VANDERBILT UNIVERSITY | ) |
| Defendant. | ) |

## MEMORANDUM

Plaintiff William Lyons brings two claims—alleging a hostile work environment and retaliation—under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e. (Docket No. 1.) Defendant Vanderbilt University moves for summary judgment on both claims. (Dockets No. 19, 20.)

The Court will DENY Defendant's summary-judgment motion on Plaintiff's hostile-work-environment claim, but will GRANT Defendant's motion on the retaliation claim.

## BACKGROUND

The following facts are undisputed. Plaintiff is a Floor Tech in the Facilities and Operation Department at Vanderbilt University School of Medicine. His job consists of custodial duties, such as mopping hallways, cleaning stairwells, and buffing laboratory floors. He has had the job since 2003.

There are three levels of supervision in Plaintiff's department. The Techs report to a Service Supervisor II. These supervisors have the most direct contact with Techs and are "responsible for . . . day-to-day operation of" the cleaning staff. (Docket No. 22-2, p. 9.)

1

Service Supervisors II report to a single manager—the Service Supervisor III—who oversees all of the cleaning crews for that shift. Melvin Robinson is the Service Supervisor III for Plaintiff's shift. Robinson reports to Freddie Easley, Director of Facilities and Operation at the School of Medicine.

In 2008, Barbara Nash became Plaintiff's Service Supervisor II. Within a few months, she began to make Plaintiff feel uncomfortable. She regularly called Plaintiff at home whenever Plaintiff would take a day off from work, asking him why he had not shown up. (Docket No. 22-1, p. 9.) Even when Plaintiff explained that he had told the main office about his absence, as he was required to under department policy, Nash would continue calling Plaintiff. Plaintiff felt that Nash's calls were inappropriate. As he put it, "she kept trying to reach [him] when she [knew] the procedures." (Docket No. 22-1, p. 9.)

As time went on, Nash's conduct became more worrisome. In his deposition, Plaintiff noted that, "several times," Nash gathered the entire staff and told them that she liked Plaintiff. (Docket No. 22-1, p. 9.) He also said that she "trie[d] to talk to [him] in . . . a baby voice, like sexually," while staring at him. (Docket No. 22-1, p. 9.) And when Nash gave staff members work assignments, she sometimes grabbed Plaintiff's hand and led him away towards his work area. She seemed to single Plaintiff out whenever she made these types of comments; he noticed that "she wasn't doing anybody else like that." (Docket No. 22-1, p. 10.)

Other comments were sexually suggestive. After Plaintiff bought his car—a red pickup truck—Nash told him that he "got that . . . pretty red truck to attract younger women," and that he "needed to get rid of" his fiancée and "get an older, sophisticated lady like her." (Docket No. 22-1, p. 10.) When Plaintiff and another coworker happened to miss work on the same night, Nash made comments implying that the two had been having an affair. Nash also shared

2

unsolicited personal information with Plaintiff, including her sexual problems with her husband. Plaintiff remembers that other staff members were around when she talked about her personal life, "but mostly she was talking to [him]"—she "was looking at [him], talking and facing [him] when she was saying these things." (Docket No 22-1, p. 10.)

Even when Nash's behavior had no overt sexual connotations, Plaintiff still found it strange and intrusive. He remembers that she attended his mother's funeral, uninvited, then denied having attended. (Docket no. 22-1, p. 44.) He also recalls her showing up to Plaintiff's second job—he was a security guard at a local wave pool—during Plaintiff's days off from Vanderbilt. She would also interrupt his lunch breaks, especially when Plaintiff was by himself. All of this unsettled Plaintiff. Before long, he would "just g[e]t up and le[ave] out of the room" whenever he saw Nash nearby. (Docket No. 22-1, p. 12.)

Staff members also noticed Nash's behavior. Plaintiff remembers that they often "tease[d]" him about "[his] woman, [his] girlfriend." (Docket No. 22-1, p. 9.) Others would ask him why Nash was comfortable talking about her family life with Plaintiff. Each time that his coworkers brought it up, Plaintiff reiterated that he was not interested in Nash, and that he "wish[ed] she would . . . stop that." (Docket No. 22-1, p. 9.)

Little changed. Nash continued to call Plaintiff during non-working hours. One night, she called Plaintiff's home while intoxicated and told Plaintiff that he "was a real nice person."[1] (Docket No. 22-1, p. 44.) She also continued touching plaintiff, often grabbing his wrist and telling him that she would "show [him] what [she] want[ed] [him] to do." (Docket No. 22-1, p.

---

[1] In his 2012 internal grievance, Plaintiff wrote that Nash had said only that he was a "real nice person." (Docket No. 22-1, p. 44.) But in his deposition and Complaint, he stated that Nash had also asked him if she could "come over and get in bed with [him] and have her way with [him]." (Docket No. 22-1, p. 9.) Defendant seems to assert that Nash made the first remark—that Plaintiff was a "real nice person"—but never made the remark about "hav[ing] her way with" Plaintiff. (See Docket No. 21, p. 5.) For the purposes of this motion, Plaintiff does not dispute Defendant's version of the phone call. (See Docket No. 24, p. 4.)

3

10.)  On February 14, 2012, Nash told Plaintiff to wish her a happy Valentine's Day, then approached Plaintiff—who was standing against a wall—and wrapped her arms around Plaintiff's waist.  When Plaintiff became uncomfortable, Nash said that she knew he "want[ed] to hug [her] back," but was "just scared of [her]."  (Docket No. 24, p. 5.)

Some of Nash's behavior was even more invasive.  Plaintiff stated that Nash sometimes followed him into a utility closet while he was getting prepared for work.  According to Plaintiff, Nash then pretended to look for items on a high shelf behind Plaintiff while pressing her body against him: she "would reach up on the shelf behind [Plaintiff] and rub her breasts up against [him]," while telling him that she was "turn[ing] around" the label on a bottle.  (Docket No. 22-1, p. 11.)  He also testified that she would face the opposite wall in the closet, then "bend over in front of [him]."  (Docket No. 22-1, p. 11.)  The closet was very small—by Plaintiff's guess, only "[a]bout 2 or 3 feet wide"—leaving no room for Plaintiff to avoid physical contact with Nash.  Plaintiff said that "just about every time" that Nash touched him in the closet, he asked her to let him leave.  (Docket No. 22-1, p. 19.)  She ignored his requests.

Plaintiff spoke to his superiors about Nash several times.  After Nash called Plaintiff while she was intoxicated, Plaintiff approached Robinson and asked him to speak to Nash about her inappropriate behavior.  Plaintiff stated that Robinson refused to "do something about it" and that "nothing was done."   (Docket No. 22-1, p. 10.)  Freddie Easley also recalls Plaintiff speaking to him about Nash, but stated that Plaintiff "[n]ever" mentioned sexual harassment.  (Docket No. 22-2, p. 21.)  Instead, Easley recalls Plaintiff's complaints were "about the management style of Miss Nash."  (Docket No. 22-2, p. 22.)

In November 2012, Plaintiff filed a grievance with Vanderbilt's Equal Opportunity, Affirmative Action, and Disability Services Department ("EAD").  (Docket No. 22-1, p. 40.)  In

the grievance, he wrote that "[s]ince [he] will not show [Nash] any interest . . . she has retaliated against [him]." (Docket No. 22-1, p. 44.) He also wrote that Nash reprimanded him for minor errors in his work, accused him of using drugs, and regularly threatened to fire him. (Docket No. 22-1, p. 44.) The working environment was so intolerable, Plaintiff wrote, that he suffered anxiety-related medical problems—to the point of spending a night in the emergency room with severely elevated blood pressure. (Docket No. 22-2, p. 45.)

After he filed the grievance, Plaintiff began to feel as though Nash was treating him harshly. He recalls her sharply criticizing him, often telling him that "everything [he] did was wrong." (Docket No. 22-1, p. 13.) He also stated that she gave him several days' worth of work to complete in a single night, loudly accused him of drinking on the job, and sent him to Robinson for discipline over minor errors. He testified that she yelled at him, belittled him in front of his coworkers, and "told [him] to shut up." (Docket No. 22-1, p.19.)

Plaintiff was transferred to another Service Supervisor II—Larry McKissack—in January 2013. From that point on, he had no contact with Nash. But he felt that his supervisors continued to retaliate against him for filing an EAD grievance against Nash. Plaintiff points out that, after being transferred to McKissack, he was not allowed to smoke during his 15-minute breaks. He notes that this restriction is not Vanderbilt's policy and believes that it "was all because of" the EAD grievance. (Docket No. 22-1, p. 85.)

Plaintiff eventually decided to sue. This action followed.

## **LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); Pennington v. State Farm Mut. Auto. Ins. Co., 553 F.3d 447, 450 (6th Cir. 2009). The party bringing the

summary-judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the nonmoving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. Id.

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the nonmoving party. Van Gordner v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. Id. The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party. Rodgers, 344 F.3d at 595.

## ANALYSIS

A Title VII violation requires a showing that "discrimination based on sex created a hostile or abusive working environment." Burnett v. Tyco Corp., 203 F.3d 980, 982 (6th Cir. 2000). To establish a prima-facie hostile-work-environment case, Plaintiff must show that (1) he is a member of a protected class; (2) he was subjected to unwelcome sexual harassment; (3) the harassment was based on his sex; (4) the harassment created a hostile work environment; and (5) Defendant knew or should have known about the harassment, yet did nothing. Randolph v. Ohio Dep't of Youth Servs., 433 F.3d 724, 733 (6th Cir. 2006).

### I. Plaintiff's Hostile-Work-Environment Claim

Defendant's brief did not address four of the elements of Plaintiff's hostile-work-environment claim—whether Plaintiff is a member of a protected class, whether he experienced unwelcome harassment, whether the harassment was based on his sex, and whether Defendant knew about the harassment and did nothing. As the movant, Defendant had the initial burden of citing particular facts to support its argument. Celotex v. Catrett, 477 U.S. 317, 323 (1986). For these four elements, Defendant failed to carry its summary-judgment burden. Cf. Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009) (finding that the defendant's burden when moving for summary judgment is to "inform[] the district court of the basis for its motion and identify[] portions of the record that demonstrate the absence of a genuine dispute of over material facts"). The Court will address only the fourth element of Plaintiff's claim—whether Nash's harassment created a hostile work environment.

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Specifically, Plaintiff must have established two factors: (1) that the harassing behavior was "severe or pervasive" enough to create an environment that a reasonable person would find objectively hostile or abusive, and (2) that he subjectively regarded the environment as abusive. Id. at 21–22; see also Barrett v. Whirlpool Corp., 556 F.3d 502, 514 (6th Cir. 2009) ("[A] disjunctive test, i.e. "severe *or* pervasive," is proper.").

Defendant argues that the facts do not show conduct that "rose to the level of . . . a hostile work environment." (Docket No. 19, p. 1.) Specifically, Defendant contends that Nash's

7

conduct is "not as severe as[] the alleged harassment in other cases in which the court found" that there was no hostile work environment. (Docket No. 20, p. 9.) These cases, Defendant argues, show that "[a]lthough . . [Nash's] actions may have been in bad taste," her behavior "was not sufficiently severe . . . , and certainly not pervasive[,] given that [it] occurred sporadically over a four-year period." (Docket No. 20, p. 12.)

The Court disagrees. There is a genuine issue of material fact as to whether Nash's behavior was severe enough to make Plaintiff's work conditions hostile.

Particularly troubling were the allegations of Nash touching Plaintiff in a small utility closet. A reasonable jury could find that this alone was severe enough to create a hostile work environment. The Sixth Circuit has held that a supervisor's conduct creates a hostile work environment when it is "not merely crude, . . . but also contain[s] an element of physical invasion." Williams v. Gen. Motors Corp., 187 F.3d 553, 563 (6th Cir. 1999). The Circuit affirmed this principle in Ault v. Oberlin College, 2015 WL 4503200 (6th Cir. July 24, 2015). In Ault, a supervisor followed an employee into a walk-in cooler and stood behind her while she arranged items on a shelf. The supervisor then pressed his crotch against her body. He stood "directly against [the employee] so that she could feel his penis, trapping her in position and remaining there despite [her] telling him to remove himself." Id. at *6.

Nash's behavior is almost identical to the supervisor's in Ault. Plaintiff stated that Nash would "wait until [he] would go in [the utility closet], and then she would come in." (Docket No. 22-1, p. 11.) Once she was in the cramped space with Plaintiff, she rubbed her breasts against his chest and "ben[t] over in front of" him." (Docket No. 22-1, p. 11.) He asked her to let him out of the closet, but she ignored him. She simply said, "I'm the supervisor. I go where I want to go." (Docket No. 22-1, p. 19.) See Ault, 2015 WL 4503200, at *8 (noting that

8

supervisor "positioned himself in a way that prevented the employee from moving," despite the employee's "repeated requests" that he let her leave the cooler).

Nash's conduct is also distinguishable from that of the supervisors' in the cases that Defendant cites. In Bowman v. Shawnee State University, 220 F.3d 456 (6th Cir. 2000), there were only three incidents of physical invasion, and only one incident in which the touching was overtly sexual: the supervisor rubbed the employee's shoulder "for approximately one to two seconds," put "her finger on [the employee's] chest," and "grabbed [the employee's] buttocks." Id. at 458–59. In Stacy v. Shoney's, Inc., 1998 WL 165139 (6th Cir. Mar. 31, 1998), there was only one incident of physical contact: a supervisor "inappropriately touched the employee's breast when he removed and replaced an ink pen from her front shirt pocket." Id. at *1. And in Hudson v. M.S. Carriers, Inc., 353 F. Supp. 2d 853, 857 (W.D. Tenn. 2003), an employee had alleged that a supervisor briefly touched her four times—on her ear, feet, and shoulder.

While degrading and offensive, the conduct in those cases is not nearly as physically threatening as Nash's conduct. Unlike Plaintiff, the employees in Bowman, Stacy, and Hudson were never confined in a small space when their supervisors harassed them. They never experienced sustained offensive touching from their supervisors, as Plaintiff did. (Docket No. 22-1, p. 11.) And though they may have been humiliated, their bodily integrity was not violated in the same way that Plaintiff's was when he felt Nash "rub[bing] her breasts up against" him. (Docket No. 22-1, p. 11.) See Ault 2015 WL 4503200, at *7–8 (distinguishing facts from other cases in which physical contact might have been "humiliating but was not [as] threatening . . . [or] invasi[ve]").

A jury could also find that Plaintiff subjectively felt that his work environment was abusive and hostile. In Plaintiff's deposition, he said that he "[f]eared for [his] job" and was

"taunt[ed] [by] [his] coworkers every day." (Docket No. 22-1, p. 16.) Plaintiff also said that he sometimes "didn't come to work" to avoid dealing with Nash. (Docket No. 22-1, p. 16.) And in his EAD grievance, he wrote that Nash created "a hostile environment" during his shifts. (Docket No. 22-1, p. 45.) Indeed, the fact that Plaintiff filed his EAD grievance at all suggests that Plaintiff felt that his workplace had become abusive. See, e.g., White v. Burlington N. & Santa Fe. Ry. Co., 2000 WL 35448692, at *4 (Aug. 28, 2000) ("The subjective element of the analysis is met since Plaintiff has on several occasions complained about the acts and sought redress through the EEOC and now the Court.").

There are serious questions of fact as to whether Nash's behavior was "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment." Harris, 510 U.S. at 23. The Court denies Defendant's motion on Plaintiff's hostile-work-environment claim.

## II. Plaintiff's Retaliation Claim

Defendant also moves for summary judgment on Plaintiff's retaliation claim. The core of that claim is straightforward: After Plaintiff filed his EAD grievance, he "began to experience retaliation . . . for having made his complaint." (Docket No. 23, p. 3.)

To establish a prima-facie case of unlawful retaliation under Title VII, Plaintiff must show that (1) he engaged in a protected activity; (2) Defendant knew about his protected activity; (3) Defendant took materially-adverse action against Plaintiff after his protected activity; and (4) there was a causal connection between the activity and the materially-adverse action. Burlington N. & Santa Fe Ry. Co., 548 U.S. at 67–68; Morris v. Oldham Cty. Fiscal Ct., 201 F.3d 784, 792 (6th Cir. 2000).

Defendant concedes the first two retaliation elements—that Plaintiff's EAD grievance was a protected activity and that Defendant knew about it. But Defendant contends that none of Plaintiff's allegations have any causal connection to Plaintiff's EAD grievance. And even if there was a causal connection, Defendant continues, none of the allegations show "materially adverse" conduct. The Court agrees.

Plaintiff argues that Nash retaliated against him in a few ways. Specifically, he points out that she (1) told him to "shut up" in front of his coworkers (Docket No. 22-1, p. 19); (2) told him to do two or three days' worth of work in a single shift; (3) sent him to Melvin Robinson's office for minor infractions; (4) yelled at him and pointed her finger in his face. Nash did all of this, he argues, because he filed his EAD grievance against her in November 2012.

But in order to show a causal connection, Plaintiff must demonstrate that Nash's behavior changed after he filed the EAD grievance. If Nash behaved the same way after the grievance as she had before, there would be no causal connection between the grievance and her conduct. See, e.g., Clark v. City of Dublin, Ohio, 178 Fed. App'x 522, 525 (6th Cir. 2006) (finding no causal connection when plaintiff faced the same discipline before and after he engaged in protected activity); Williams v. William Beaumont Hosp., 2007 WL 4455023, at *5 (E.D. Mich. 2007) (finding no causal connection when plaintiff engaged in protected activity after supervisor had already decided to fire her). The question for the Court is straightforward: Was Nash always this bad?

Apparently so. Plaintiff concedes that Nash regularly berated Plaintiff long before he filed his EAD grievance. His brief notes that, "during the . . . four years [before his EAD grievance]," Plaintiff was "yelled at and told to 'shut up' multiple times" and "inappropriately touched and gestured at" by Nash. (Docket No. 23, p. 11.) He also admits that Nash disciplined
11

him for questionable reasons before the EAD grievance. In his deposition, he said that Nash "would lie [to Robinson] and say that [Plaintiff] wasn't doing [his] work." (Docket No. 22-1, p. 49.)

These facts show no causal connection between the EAD grievance and much of the conduct that Plaintiff cites—specifically, Nash yelling at him, pointing at his face, telling him to shut up, or sending him to Robinson for minor infractions. This leaves only two potential retaliatory actions: Nash giving Plaintiff three days' worth of work to do in a single shift, and McKissack refusing to let Plaintiff smoke during his breaks. Neither is enough to make out a prima-facie case for retaliation.

Plaintiff's increased-workload allegation is simply too insignificant to be materially adverse. The Sixth Circuit has never held that temporarily increasing an employee's workload is a materially adverse action. See, e.g. Johnson v. United Parcel Serv., Inc., 117 Fed. App'x 444, 450 (6th Cir. 2004) (finding that rescheduling a worker to give him a difficult workload was not a "materially adverse" employment action); Ortix v. Hershey Co., 2013 WL 5538657, at *9 (W.D. Tenn. Oct. 7, 2013) ("Generally, an increased workload or 'alteration of job responsibilities' does not constitute a materially adverse employment action."); Jones v. Donahue, 2013 WL 4042039, at *3 (W.D. Ky. Aug. 8, 2013) ("A substantial increase in work load alone does not qualify as a materially adverse change."). Only when accompanied by other, more severe retaliatory actions would an increased workload be materially adverse. See, e.g. Ford v. Gen. Motors Corp., 305 F.3d 545, 554 (6th Cir. 2002) ("Plaintiff's increased workload, heightened scrutiny, and constructive discharge[,] . . . taken together, . . . constituted materially adverse employment action sufficient to satisfy the third prong of the *prima facie* test."). In light of this precedent, Plaintiff's increased-workload allegation is particularly weak: he alleges that

Nash gave him too much work on "one night" in late 2012. (Docket No. 22-1, p. 13.) He never alleges that Nash increased his work again, nor does he allege that the one-night increase had any effect on his pay, benefits, or status at work. Without more, this allegation fails to meet the Sixth Circuit's definition of a materially adverse action. See Blackburn v. Shelby Cty., 770 F. Supp. 2d 896, 922 (W.D. Tenn. 2011) ("Plaintiff's . . . increased case load . . . [was] not actionable as [an] adverse employment action[]" when there was no difference in pay, benefits, or prestige).

The same is true for Plaintiff's allegation that McKissack kept him from smoking during his breaks. Courts in this Circuit have repeatedly held that restricting an employee's free time, even during scheduled breaks, is not materially adverse. Worthy v. Materials Processing, Inc., 2011 WL 3154750, at *1–2 (6th Cir. 2011) (holding that taking away an employee's breaks does "not change [her] salary, benefits, title, or work hours, even if they make the employee's job significantly more difficult"); Berryman v. Supervalu Holdings, Inc., 2010 WL 1257845, at *12 (S.D. Ohio Mar. 31, 2010) (reprimanding an employee for activity during his break time was not "materially adverse"); Eberhardt v. First Centrum, LLC, 2007 WL 5188896, at *6 (S.D. Mich. 2007) (finding that a policy of "shorter restroom breaks . . . does not fall along the lines of" a materially-adverse employment action). And there is nothing special about smoking that would make Plaintiff's allegation more compelling than those cases. See Mynatt v. Morrison Mgmt. Specialist, Inc., 2014 WL 619601, at *7–8 (E.D. Tenn. Feb. 14, 2014) ("Plaintiff has not . . . shown that she was subjected to an adverse employment decision . . . [by alleging that] a male employee was allowed to smoke more.").

Plaintiff has failed to make out a prima-facie case for his retaliation claim. The Court therefore grants Defendant's motion on this claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's motion for summary judgment. An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE